We're very pleased to welcome sitting with us, Judge Alsop. Well, an honor to be here. Thank you. The first case this morning is number 2008, 1040, Mittal Steel v. United States. Mr. Pass.  May it please the Court. The Department of Commerce has an obligation to explain its decisions so the path of the agency's reasoning can be determined. In its decision to exclude sales of composite wire rod from the home market sales in its matching methodology, in this administrator view, Commerce did no such thing. It did not explain its decision in any way so that either plaintiffs, appellants or appellees could understand that decision. Didn't they find, as a matter of fact, that the composite wire differs from prime physically and in terms of price? Aren't those fact findings to which we must defer? Doesn't that decide the case? Your Honor, I respectfully disagree. I think that Commerce made a number of statements in its issues and decision memorandum and in doing so conflated two distinct issues. Number one, is composite wire rod prime or non-prime? And number two, is composite wire rod identical or not identical? Now, on the issue of prime, Commerce referred only to the fact that Middle distinguishes composite wire rod on its home market sales sheets by not calling it prime. They call it composite wire rod. And in doing so, they sell it at a different price than the product which is marked on the sales sheet as prime. Now, first of all, I'd submit to you that Middle's description of its merchandise on a sales and marketing sheet faxed to its home market customers is not dispositive as to whether this product is prime or non-prime. It deals with the commercial reality of the market in Trinidad. But you're saying they treated them differently. I'm saying they treated them differently, but not because one is prime and one is non-prime. They treated them differently because, as we described in our brief, one type of coil is a continuous coil of approximately two metric tons in weight. The other coil, composite wire rod, is a combination of two coils joined together to meet an industry standard of two metric tons. Physically, metallurgically, end use, these rods are completely the same. They have no distinction to the customer in terms of what that customer is going to do with this rod. I thought it was undisputed that there was a recognized distinction and that the only question was which price should be the measure for calculating the differential. The distinction between the two rods is whether one is a continuous rod of two metric tons versus one that is a joining of two separate pieces to make two metric tons. The end use is the same. The metallurgy is the same. The eight matching criteria established by Commerce Department, grade range, carbon range, diameter, et cetera, et cetera, et cetera, are all the same. The product is priced differently to compensate the end customer for reductions in efficiencies in running this product through its plant. If you take this to the next step, what Middle is saying to its customers is we understand that this is going to cost you more to run in your plant because you need to stop the machinery and reload the second half of the coil. We're going to compensate you for that so that, in the end, when you sell this product to your end customer, you don't take a hit on your profit margin. This ends up being the same commercially viable product for you, our Middle's customer, as any other rod that we're selling you. You can sell it to your same end customers, you can sell it for the same use, and you can end up making the same amount of money on this as any other rod we sell you. I'd submit that the price differential, then, is a result of compensating the customer and not for this inefficiency, as opposed to compensating the customer because this wire is less than perfect, less than what they need to satisfy their end users. Now, Commerce did two things. They relied solely upon this price sheet definition for the product to be non-prime, but they didn't explain what their definition was of prime versus non-prime. There's no clear standard out there. There are a variety of cases, all of which talk about different measures for whether a product is prime or non-prime. Middle classified this product as prime because it can be used for the same end use, the same application as all of the other rods sold in the home market. That definition coming from Acce Speciale Terni, which is this stainless steel sheet and strip from Italy case, which stated products with a surface defect or other physical defects that precludes the merchandise from being used for its intended application, is non-prime merchandise. Here, as I've stated previously, this product can be used for its intended application and, as such, is prime merchandise. That aside, if the DOC had decided that this product was non-prime, they needed to tell us on what basis they decided. They needed to tell us why they found it non-prime. They didn't do it here. And that is why we believe that this decision should be remanded. You're arguing not that they were wrong, necessarily, but that they didn't explain it properly. Yes, Your Honor. I'm arguing, first, that they didn't explain it. And on that basis alone, everything that comes after, whether it's prime or non-prime, identical or similar, really is secondary. This case needs to be remanded so that commerce can tell us why they decided what they decided. Then we can argue about the facts. It's interesting to note that in commerce's decision, they talked about prime product, they talked about identical product, and it wasn't until we got to the CIT, to the lower court, that the CIT came out and said that their belief was that commerce made this decision on the fact that this is non-identical merchandise. The briefs before you in this case, the government has come forward and said, no, no, this is an issue of prime versus non-prime. Nobody knows why commerce made their decision. We've been arguing about this for three years. And that, really, Your Honor, is why we've brought this case. We want to know what the basis of the decision was because commerce has an obligation to tell us that. Now, on the issue of identical merchandise, the lower court believes that commerce's decision was on the basis that it was non-composite wire rod. They found this not because of any physical characteristics or matching methodology or matching characteristics that didn't align. They found this because, based on Pesquero-Mares, they found that composite wire rod had a commercially significant difference than non-composite wire rod. But none of that is really disputed, is it? The fact that there are technological differences isn't in dispute. The fact that they sell at different prices, whatever the reason for the differential is, isn't in dispute. What was there to explain as far as those threshold considerations are concerned? Well, I think the issue here is whether there's a commercially significant. The lower court believed that there was a commercially significant difference between these two products. They believed that was the basis for commerce's decision, although commerce never said this. The lower court went into an analysis that basically said, this product, regardless of physical and metallurgical distinctions, because it's sold at a lower price, is commercially different. There's a commercially significant difference between this and non-composite wire rod. Here we respectfully disagree with the lower court. We believe, as I've explained previously, that that price differential is not commercially significant because it doesn't mean anything to the customer. All it means to the customer is that they will end up with a product upon which they can make the same amount of money as any other product they're buying from Middle. And to expand on that, let me make one other point. Price alone, we believe, if we're going to talk about this issue, price alone can't be a basis for deciding that a product has a commercially significant difference. If that were the case, petitioners in this case and every other trade case would be arguing that any outlier price be thrown out, which would artificially inflate all respondents' dumping margins. Basically, were the lower court's analysis of commercially significant to be upheld, we're basically saying that any identical product sold in the home market, sold at a lower price, for whatever reason, can be tossed out. I would submit that that will have deleterious impact on dumping margins by artificially inflating them for all respondents. May I ask you one question? Maybe I'm not looking at the right decision, but the appendix has this sentence by the Department of Commerce. It says, in this review, we did not use the wire rod, which was not identified as prime, on CIL's price list for matching purposes. So isn't that an explanation for why they came to that decision? Your Honor, I believe that while it... I think it's the shallowest of explanations, if it qualifies as an explanation. It says it's not on the price list. That's the way I read it. It was not treated as prime on your price list, and therefore they didn't use it. That's the reason stated here in the Department's position. Fair enough. The standard for prime versus non-prime doesn't address whether a product is on a respondent's price list or not. Commerce doesn't take that statement, that composite wire rod is not listed as prime, quote-unquote, on the price list, and tie it into any accepted definition of what non-prime merchandise is. As I stated earlier in the stainless steel sheet and strip case from Italy, they talked about whether the product can be used for its intended application. Commerce doesn't address that issue at all. Commerce says it's not on your price list as prime, so therefore it isn't prime. It's interesting that in that same case, the Acai Speciale case, Commerce, in oral argument at the CIT, said to the court, in circumstances quite similar where a respondent had identified a product as prime or non-prime on its price sheet, they said the industry's definition of prime doesn't necessarily meet and match what the Department of Commerce's definition of prime is. My point here being that what middle does on its commercial, on its price sheet, what it does in the marketplace, I think it would be wrong for us to impute knowledge of the definition of non-prime merchandise in the context of an anti-dumping investigation to the sales and marketing department of a steel company in Trinidad. I just can't see that. Let's hear from the other side. We'll save you a little time. Ms. Daly. Good morning. May it please the court, I'm here, I'm with the law firm of Kelly, Dry and Warren, and we are representing the domestic industry in this appeal. We are the cross-appellants, and we have an issue that we have also raised in this appeal as the cross-appellant. And there's only one issue that we have raised, and that is should commerce have used the shipment date when it calculated middle's credit costs? Wasn't that waived by not raising it on remand? No, Your Honor, it was not waived because I had raised this argument several times. I had raised it three times before the Commerce Department, and I had raised it two times before the Court of International Trade. On remand when it was sent back to the Commerce Department? I did not raise it at that time, Your Honor, because I believed that it would be futile because commerce had already made its decision that this was what it was going to do. I had made my position very clear that the shipment date should be used. And also, Your Honor, it would have been futile for me to raise it, and the subsequent administrative review that came out before that remand,  I had raised objections. I had met with the Deputy Assistant Secretary of Commerce, Stephen Clays, on this issue, and commerce had made its decision erroneously on a legal matter that they were going to use the date of sale and not the date of shipment. And our position is that this is a clear issue of law, Your Honor, where the facts of this case are not relevant to whether commerce should have followed its policy by using the date of shipment. So no, Your Honor, I don't believe that I waived this argument. I've raised this so many times with the Commerce Department that I've sort of lost count how many times in the context of this administrative review. You know, there are a lot of boxes you have to check on the sequence of legal actions. This is one box you didn't check. Your Honor, I could have filed a letter saying that I disagreed with them. My view was that at that point it was futile. I knew what Commerce's position was. I was not going to change their mind. And in my view, the only way that I was going to change their mind was by coming and filing an appeal on a purely legal issue. All right, tell us why you should change, why we should change their minds. On this issue, Your Honor, Commerce, in every single case since they have begun administering this law, and every case after this with the exception of these two administrative reviews, Commerce has always used the date of shipment. And it is a legal question because the date of shipment is the beginning period for the credit cost calculation. It is the lost opportunity cost that Commerce is trying to calculate. If a producer issues an invoice at any time or engages in subsequent price negotiations, that has absolutely no impact whatsoever on the lost opportunity costs that are incurred. Those lost opportunity costs begin when it ships the merchandise directly to the customer. Then it is directly related to that sale. It's interest revenue foregone. Commerce seemed to think that title didn't pass, there had been no invoice, and that once it reached the United States it could, in fact, be diverted. Isn't that a difference from many of the usual date of shipment cases? Your Honor, it's not actually unusual at all. It's very often the case, and we've cited many cases, where the invoice will be shipped after the date of shipment. That does affect the material terms of sale, but it doesn't affect the lost opportunity costs. This is where Commerce erred, because it was confusing two ideas. It was confusing setting the date of sale with when the lost opportunity costs begin to middle. For example, let's say that I buy an iPhone from Apple. Apple has invested a lot of money, a lot of raw material costs, labor, energy in that product. When it ships that good directly to me, that's when its opportunity costs begin. It might delay sending an invoice to me because it wants to provide a benefit to me as the customer, but delaying an invoice or renegotiating price at any time after the shipment, that does not change the opportunity costs that are being incurred for Apple on that iPhone that it shipped me. Isn't the difference in your example between shipping it directly to you and shipping it to a subsidiary that will transship it in the United States? Commerce felt that, again, title didn't pass when it was shipped from Trinidad. Absolutely, Your Honor. That would be the case if Middle had in fact shipped it to its affiliate, but it did not. The facts of record on this case are very clear. Middle was shipping directly to its customer. It did not ship to its affiliate. In that case, then the question becomes, what is the proper date of shipment? But still, even in cases where there are sales where a foreign producer ships it to an affiliate and then the affiliate ships it on, the question still becomes, when is the proper date of shipment? It's not when the date of sale issues or the invoice date. The invoice date really is completely irrelevant to that. Middle or Apple or whoever ships its invoice at its own discretion as a benefit to its customer. On this theory, Commerce would have to distinguish between those situations where the shipment was directly to the ultimate customer and where the shipment went to the domestic affiliate. Yes, Your Honor, and Commerce does that all the time. There are many cases in that instance. But the question is, when is it directly related to the sale? But even in those cases where they might ship it to the affiliate, the starting point for the opportunity cost is always the date of shipment, never the date of sale. It's always the date of shipment. In every single case that Commerce has ever done, ever, in its whole time that it has been administering this law, it has always used the date of shipment. There are factual questions about when the date of shipment occurs. Does it occur when the affiliate ships it out of its inventory? Does it occur when the foreign producer ships it from its port? But those are all factual questions about the date of shipment. In this case, Middle reported the date of shipment. There's no factual dispute about when the date of shipment occurred. So when you're talking about shipments to affiliates, yes, at some times, Commerce will use the date of shipment from the affiliate's inventory out of its warehouse in the U.S., but it always uses the date of shipment. It never uses the date of sale or the date of invoice because that is an arbitrary date picked by the Middle to decide when it's going to invoice its customers. But it has absolutely no bearing on the opportunity costs that are incurred by the producer itself. Those opportunity costs represent the time value of money, the money that it's put into its factory to produce it, the raw materials, the energy, the labor costs. Those are the opportunity costs that we're talking about. And when it relinquishes physical control of the merchandise, either at its port or at its affiliate, that's when the credit cost period begins. In every single case, every single case, Commerce has always used the date of shipment, regardless of when the invoice has occurred, regardless if prices haven't been negotiated afterwards. That happens all the time. There's nothing, absolutely nothing unique about this case whatsoever. We've cited many cases when invoice date has occurred after the date of shipment. But what has Commerce done? It's even explained. Parties are confusing the date of sale with the date of shipment. Don't do that for credit costs. You always start credit costs with the date of shipment. In this case, there's absolutely no question about the factual time when the date of shipment occurred. Middle reported the date of shipment. That's the date that Commerce should have used. Okay, now you're into your colleague's time. Okay. Yes, that's all on my issue. Okay. Thank you. Good morning. Thank you. First, I'd like to address the arguments raised by Mittal. Notwithstanding Mittal's arguments, Commerce's determination here is straightforward. Mittal tries to muddy the waters by saying, well, there are two possible paths to determine whether merchandise is prime or non-prime on the one hand. Maybe the merchandise is not identical to prime because there's a commercially significant difference around the other. Perhaps there's a defect in the merchandise. That's a false dichotomy. Here, Commerce determined that based on Middle's own submission, Middle's own documents, Middle treated composite wire rod as non-prime. Its own documents refer to prime wire rod and a composite wire rod. There's no dispute that the same document shows that Middle prices composite wire rod differently from its prime wire rod. As a result, Commerce found that composite wire rod was not prime. Further, the fact that it's priced differently obviously shows that there's a commercially significant difference. Moreover, Middle says that the production process produces a physical difference between composite and prime wire rod. That, of course, provides the basis for the price difference between the two products. Obviously, that's commercially significant. I just want to emphasize the purposes for Commerce to make an apple-to-apples comparison. Here, Middle had prime wire rod in the United States, so Commerce compared that prime wire rod to a Middle call that's prime wire rod in the home market. But Middle says that they essentially give a discount to account for additional costs that are incurred in the United States by the purchaser. I think what they say, that's true, they say that the discount is to compensate for certain inefficiencies that result to the end consumer. In other words, the end consumer can't use composite wire rod the same way it uses prime wire rod. There are inefficiencies in the process, and I don't want to get into the detail because it's business proprietary, but if the court would look at page 1306, the joint appendix, that's where Middle explains the process that it goes through for producing a wire rod. It says that there is a difference, obviously, between composite and prime, and the difference matters to the end user. That's evidenced by the fact that there's a price difference. They say it also equalizes the price. That it was a mistake to choose one over the other. I'm sorry, I'm not sure I understand the question. I'm trying to understand your response to Middle's argument. Well, what we're saying is that there's a price difference between the two products. Middle calls one prime, calls the other composite. That's what I wanted you to focus on. They say there really isn't a price difference. It's more a discount, which is a direct compensation for the increased cost. Sure, that's a price difference. There's no dispute that on their own documents they reflect that there is a price difference between the two products, and the reason for the price difference is because one is less efficient for the end user to use than the other. There's also a reasonable basis for that price difference, and again, that's based on Middle's own submissions to Commerce where they explain the production process. I'd like to address one point that Middle makes. Middle confuses our position regarding the Pesquero case. We never said that that case is misplaced, as they claim in their reply brief. We said their reliance on Pesquero is misplaced, and in Pesquero, this court held that Commerce can disregard minor differences in products and still find those products to be identical. That's not what happened here. Here, Commerce found significant differences in the two products. One question I have. Is the composite wire sold in the United States? No. It's just the non-composite. That's right. The so-called prime sold here, but the non-prime or the composite is not imported, correct? That's correct. Again, remember, Commerce wants to make an apples-to-apples comparison. Here, that comparison is prime wire rod sold in the United States. The question is, what do you compare it to? Do you compare it to just prime wire rod sold in Trinidad, or do you compare it to prime wire rod and composite wire rod? Commerce determined that, obviously, you want to compare apples-to-apples prime-to-prime. To compare prime-to-prime and composite would distort the dumping margin. I would like to make one other point with respect to the Akiai Speciality case, which Mattel quoted from. I just want to emphasize that the quotation that they provided was how the plaintiff in that case defined non-prime, not what Commerce said regarding how to define non-prime merchandise. Turning to Gerdao's appeal, Gerdao's way of the arguments that it raises on appeal, Gerdao failed to provide comments to the trial court when the trial court requested those comments, comments on the remand results. Now, Gerdao says, well, the trial court should have assumed it had objections because, first, it never consented to the remand results, and, secondly, it had previously provided the court or made clear to the court its position on this issue. Well, first, a failure to consent is obviously not the same as providing comments to the court when the court requests it. Secondly, the fact that Gerdao had previously filed something with the trial court is irrelevant. Those filings occurred before Commerce issued the remand results, and it was in those remand results that Commerce first took the position that's at issue here, that is, that credit expenses are calculated beginning on the date of invoice. Now, further, Gerdao also failed to exhaust its administrative remedies in addition to waiving its arguments. Gerdao failed to provide comments to Commerce when Commerce issued its preliminary results, requested comments from the parties. Gerdao provided none when Commerce issued its remand results. Webster's defines exhaust as to consume entirely. What exhaustion means is you can't just raise an issue once with an agency or twice or even three times. You have to go through the administrative process to its conclusion. You have to continue to raise the issue. You have to make your point known to the agency. This court in the AMCOR case held that exhaustion includes our very situation where Commerce issues draft remand results. A party fails to comment on those results. The trial court in AMCOR held that in that case the party cannot then raise the issue with the trial court. This court affirmed in AMCOR, and our situation for Gerdau is even worse because at least in AMCOR the party provided comments to the trial court. Here, Gerdau did not provide comments to Commerce and did not provide any comments to the trial court as well. Can I make it clear on this? After the remand while it was pending, Commerce came out with a proposed new decision. Is it correct that Commerce then expressly invited critique of that? Is that true? That's right.  has what they call preliminary remand determination. You are saying that Gerdau despite getting that notice and request failed to make any objection. That's correct. Then it goes back to the district court. You are saying the district judge also invited Gerdau to comment and Gerdau ignored. Is that right? That's right. Then the district court in its decision noted in a footnote that Gerdau had failed to provide any comments to the court. You are saying both at the  time. That's right. That's correct. Gerdau raises two exceptions. First Gerdau says this is a pure legal issue. That simply isn't the case. The issue is factual. Further, this court in the consolidated case rejected the pure legal issue exception in a commerce case. Here we only need to look at Gerdau's reply brief. One of the headings is quote the government's decision was unlawful and not supported by any evidence. As a result, the pure legal issue exception doesn't apply here. We don't understand how they can argue it would have been futile for them to address these issues with commerce when the results were the first time commerce took the  step. With respect to the merits of Gerdau's argument, credit expense is normally calculated on the date of shipment. That is based on the assumption that a company has no control over the merchandise once it has been shipped. Here it does not have control over the quantity of the goods. It is simply a unique scenario. Gerdau cited using as an example ordering from Apple computer. The difference is when I order from Apple, I know I will get one or two however many goods I ordered. The difference is Mitel can change the terms up until the date it issues the invoice. That is not true with the example cited. Finally, I want to emphasize the point of the credit expense. It represents an opportunity cost. A company can change the terms. Its opportunity cost does not begin until the date of invoice. We need to wrap it up. Thank you. For these reasons we respectfully request that the court affirm the decision and dismiss Gerdau's appeal. Thank you. Mr. Pass. I see that I have eaten into much of my time already. I have three points. Judge Newman, first of all, earlier I believe I heard you say it is undisputed that there are technological differences between prime and composite rods. I don't agree with that. I think that is not undisputed. Our position is that the only difference is price. Mr. Preheim made a good point.  goal is to make an apples-to-apples comparison. They do that based on condom. As I spoke to earlier, the composite rods are made identically on the same criteria. The only difference is price. There is no explanation as to why price is significant in their decision to not use composite rods. Finally, Mr. Preheim made one point regarding composite rods. Speaking as to why one is prime and one is not prime, he said that price is commercially significant. Unfortunately, he is conflating different ideas. The commercial significance test deals with whether products are identical or not. Thank you very much. Thank you all. You do have one minute on your cross appeal, if you can talk fast. Yes, I can talk fast. I want to talk about the exhaustion argument. We did submit comments and the Commerce Department ignored those comments. Also, before the results came out, Commerce made the same erroneous decision. At that point, we believed it would have been futile to go back to Commerce for a sixth time, making the same argument. A sixth time? Yes, Your Honor, we could have, but I don't believe that would have served any purpose. They would have been on notice that you disagreed. From your silence, they could have concluded that you had given up. There is a reason for the futility of the excuse, as it were, for exhaustion. That's because when you've raised an issue time and time again, when you've met with the decision makers at the Commerce Department and they have told you that they're not going to change their mind, filing one   of  cases is futility. I'm exhausted from raising this argument so many times with the Commerce Department. It would have been futile. It was a matter of law. The cases are very clear that we are allowed to bring matters of law before the courts, even if the Commerce Department thinks that it didn't really know what our view on this matter was. It did know. It knew our position. It ignored it. It ignored the comments that I filed during the remand proceedings in saying that you needed to use the shipment date. I submitted those comments to Commerce after the court had remanded the matter, but Commerce ignored those comments and issued its remand results. Yes, I could have filed a letter saying that once more for the 6th, 7th, 8th, 9th time that I disagreed with them, but it was a matter of law. At that level of the administration, I had made every single legal argument I could make, and it was falling on deaf ears, Your Honor. Any more questions? Any more questions? Thank you. The case is taken under submission.